## INMATE APPEAL ASSIGNMENT NOTICE

To: INMATE WALTON, F48589                           Date: July 21, 2007
Current Housing: 410 1 00000078U

From: INMATE APPEALS OFFICE

Re: APPEAL LOG NUMBER: ASP-M-07-01844

ASSIGNED STAFF REVIEWER: AW BUS SVC
APPEAL ISSUE: LIVING CONDITIONS
DUE DATE: 08/31/2007

Inmate WALTON, this acts as a notice to you that your appeal has been sent to the above staff for FIRST level response. If you have any questions, contact the above staff member. If dissatisfied, you have 15 days from the receipt of the response to forward your appeal for SECOND level review.

N. Lopez/ S. T. Smith/ H. R. Allison
Correctional Counselor II
Avenal State Prison

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION          ARNOLD SCHWARZENEGGER, GOVERNOR

**DIVISION OF ADULT INSTITUTIONS**
AVENAL STATE PRISON
P. O. Box 8
Avenal, CA 93204



July 6, 2007

Mr. Charles Walton F-48589
P.O. Box 9, 410-1-78U
Avenal State Prison

Mr. Walton,

I am receipt of your correspondence letters to J. Tilton and W. Gawsewitz dated June 7, 2007.

You state that the inmates at Avenal State Prison have, and are being denied, their Eighth Amendment Rights under the Constitution of the United States and that, "The California Department of Corrections and Rehabilitation is with deliberate indifference subjecting all Inmates to Cruel and Inhumane Living Conditions."

You also allege that inmates are being denied appropriate medical and/or psychological care and treatment. In addition, you also state that inmates do not have access to sanitary living conditions, which includes bathroom facilities and that the disrepair of these facilities causes inmates to wade and stand in human excrement (urine, feces, vomit), thus creating an unbearable cesspool for infection and disease. You state that these daily unbearable conditions subject the inmate population to pain and injury, as well as mental and emotional distress.

On July 6, 2007, L. Ochoa, Associate Warden for Facilities 3 and 4, along with the assigned facility Lieutenant, toured your specific facility for a personal assessment of your allegations. The unsanitary conditions described by you did not exist at the time of the tour. Numerous inmates, as well as the dorm staff, were interviewed. They were specifically asked about the living conditions of the unit and your allegations. The inmates noted that there have been times when bathroom facilities have not performed at their optimum; however, they also noted that staff normally contacts the maintenance department as soon as possible to correct the problem. The facilities, as well as plant ops (maintenance), keep an ongoing record of all reported plumbing problems for the facilities. When there is a report, Plant Ops will send staff to make a physical assessment and then make every reasonable effort to correct the deficiencies. Facility staff noted that the Facility Captain also takes a personal interest in his facility and personally contacts the maintenance department to report needed repairs.
Mr. Charles Walton F-48589

July 6, 2007
Page 2 of 2 Pages

In addition, Mr. Sillen, the court appointed Receiver, as well as other dignitaries, have all personally toured Avenal State Prison within the last few months. While they have addressed several areas of concern, none have noted the egregious violations noted by you. We are working closely with the Receiver and will continue to provide the best care possible for our inmate population.

Mr. Walton, Avenal State Prison has experienced some capacity and plant operational issues, however, none like what you have described. All staff at Avenal State Prison are committed to making Avenal State Prison a good, healthy environment for both its inmates and Staff.

Sincerely,

N. DAWSON
Warden (A)
Avenal State Prison

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT

FACILITY IV
MEN'S ADVISORY COUNCIL
M I N U T E S

Date:         June 25, 2007
Location:     Support Office


Staff         R.S. Lambert, Captain, Facility IV
Present       M. Contreras, Lieutenant, M.A.C. Coordinator


M.A.C.        Warner J-72537, Chairman
Present       Gary H-48321, Secretary
              (B)    Haney V-23260
              (B)    Smith V-53281
              (H)    Barragan V-12980
              (H)    Blajos B-96995
              (W)    Miller C-18272
              (W)    Chappell K-45373
              (AMI) Ramirez T-24246


The meeting was called to order at 1515 hours.


Plumbing      Chairman Warner stated there are continuing
              plumbing problems on the yard with the toilets,
              sinks, showers and drains. As soon as they are
              fixed, something else breaks. The M.A.C. had
              submitted a proposal for access to the emergency
              plumbing tools. Are inmates going to be able to
              assist the plumber? Can we have access to a
              plunger and snake?

              Captain Lambert said plumbing is one of his highest
              priorities. He has a daily report showing all the
              plumbing problems, and he is in contact with the
              plumbing staff. He also brings up the matter at
              the morning executive meetings. He said he is a
              strong advocate of fixing the problems, in any way
              possible.

Captain Lambert said the plumbers are currently
working on ADA issues at Facility V. When they are
finished there, possibly next week, they will
attempt to continue repairs. He said big money is
being spent to bring in more durable equipment. He
said wringing clothes is breaking sink parts, and a
proposal is being considered to install poles for
this purpose.

Captain Lambert said no inmates will be working as
plumbers due to a labor union issue, per the
Warden. He is looking at other ways to utilize the
inmates in some kind of capacity.

**Super
Heaters**

Chairman Warner pointed out the super heaters have
not been installed for over a year despite having
the stingers removed from the canteen for that
reason. Also, three units have no operable hot
water heaters for food or coffee. The M.A.C.
submitted a proposal to allow us to acquire hot
pots, either through SPO or packages, until the
heaters are installed. Warner noted that all the
GP yards have the heaters, but the SNY yards do
not.

Captain Lambert said this issue is at Plant Op's
level as to the lack of Plant Ops staff to perform
the installation. He noted that 420 had the pipes
installed this past weekend, but it needs an
electrician to complete the installation, who is
not currently available. However, the heaters will
be installed in all the units. In that light, and
in light of ASP's exemption, he said hot pots will
not be approved.

Counselor
Issues

Chairman Warner said the M.A.C. has been trying to meet with the CC-II since February, without success, to discuss a variety of issues.

Captain Lambert said to re-submit the request with a specific agenda.

Communication

Chairman Warner said the Chairman and the Secretary would like to be notified when modified programs are in effect so that they can pass the word to the population. Also, we'd like to have access to the Sergeants without having to get a pass written by a building officer.

Captain Lambert said he had no problem with staff telling the M.A.C. that a modified program was in effect, though the reason for the modified program may not be divulged.  He said the split yard program is still being considered by the Warden. Lieutenant Contreras said that the M.A.C. Chairman shouldn't need a pass to see the Sergeant for urgent matters.  However, the chain of command should be adhered to and attempts to resolve issues with lower levels of staff should be made.

Convenience
bed moves

Chairman Warner said many inmates, who are programming and not a problem to staff, would like to move to another bed or dorm that would be more desirable.  New arrivals are getting choice beds and we can't get a convenience move.

Captain Lambert said that was inaccurate: new arrivals are placed based on documented requirements and bed vacancies.  He said convenience moves are at the convenience of the

facility, per policy.  However, if staff are
willing to generate a move, then it's OK, but it's
not a policy.  He said staff is looking into a
procedure which would have 2/W and 3/W approvals,
as well as CC-I approval for intra-building moves.

**Warden and**            Chairman Warner said it's been well over a year
**intra-yard**            since we met with the Warden, and we have some SNY
**meetings**              issues to bring up which can be resolved only at
                          his level, such as the yard shirt policy, food
                          sales, and direct donations to the yards.  Facility
                          III has similar issues.

                          Captain Lambert said he is working on it and we
                          will be able to see the Warden, and he had no
                          problem initially with a joint III/IV meeting for
                          the Chairmen and Secretaries, but the C-Files will
                          be checked prior for enemy concerns.

**Laundry**               The M.A.C. submitted a proposal for laundry bag
                          pick-up and delivery in the housing units.  The
                          proposal has multiple benefits, including the
                          elimination of the laundry lines, U.H.T. concerns,
                          laundry during modified programs, and safety and
                          security.

                          Captain Lambert said he was supportive of the
                          concept, and would have staff talk with M&SS staff
                          to work out possible approvals.

| | |
|---|---|
| Rotating meal releases | The M.A.C. submitted a proposal to have rotating meal releases so that seconds can be issued, if available, to the last building being served. This used to be done when the yard was GP. |

Lieutenant Contreras said he liked the idea, but he has concerns with the pill line and yard release delays, as well as dawdling diners. He will look into these problems and consider the proposal.

| | |
|---|---|
| Hot pots | No. [See "Water Heaters".] |
| Night yard for A-2-B | The M.A.C. submitted a proposal to allow night yard for A-2-B inmates on those days when there was no yard during the day due to a modified program. |

Captain Lambert said "No".

| | |
|---|---|
| Buckets | The M.A.C. submitted a proposal to get more buckets in the housing units because clothes hanging hours are no longer allowed prior to 1630 and the population has increased. The M.A.C. requested to double the number of buckets available. |

Captain Lambert said we will be getting more buckets in the housing units, and to work out the details with the Sergeants.

| | |
|---|---|
| Music equipment | The M.A.C. submitted a proposal to find a spot to park the shared music equipment. |

Captain Lambert said "No". The equipment will be returned to Facility III after use.

| | |
|---|---|
| Intra-yard softball game | Captain Lambert said "No". |

| | |
|---|---|
| Yard release and recall | Chairman Warner said that there is a big variability in the times when yard is released, and also when it is recalled. For example, yard recall is typically at 1600 rather than 1630 as described in the Institutional Schedule.<br><br>Captain Lambert said there is no approved Institutional Schedule. He directed us to talk with the 3/W Lieutenant Contreras. |
| Hobby | What is the status of the hobby program?<br><br>Captain Lambert said a pilot program recently started on Facilities I and III, and if it goes OK and is approved, it may start here in about 6 months. |
| Spanish TV | Rep Barragan presented a color-coded TV schedule and said Spanish viewers would like to exchange morning viewing time for prime time. Also, he would like to change the institutional video times.<br><br>Captain Lambert said the TV schedule is fixed, approved by the Warden, and cannot be changed. He also said he was aware of the problems associated with the TV. He said that TV viewers cannot vote to see what show they want after the schedule has been approved; it must be on the approved schedule. The TV monitors are responsible for filling out the schedule. He said it has been his experience that this procedure has the least amount of difficulties associated with it. He said to do a follow-up with Lieutenant Contreras. |
| Supplies | The M.A.C. has none. Lieutenant Contreras said an order is being placed for the end of June. Captain Lambert said the M.A.C. is allowed all the DOM and OP supplements requested. |

**M.A.C.
postings**

Rep Miller said the population has no idea of what the M.A.C. is doing because we are not allowed to post our agendas and proposals. It would help us do our job if we got feedback from the population on our proposals.

Chairman Warner cited DOM 53120.7.3, which was read by Rep Chappell:

> The general inmate population should be aware of all formal agenda items and the results of the IAC's meetings with the Warden and their administrative staff. Wardens shall provide bulletin boards in conspicuous locations throughout the institution, facilities and units, accessible to the general inmate population, or space made available on such existing bulletin boards, for posting of approved material by the IAC.

Captain Lambert said right now, only minutes from meetings will be posted, and only after he has reviewed and approved them.

**Positions**

Captain Lambert said he had some concerns that the M.A.C. body was not properly constituted. He said that a six-month M.A.C. representative requirement existed for the Chairman and Secretary positions.

Chairman Warner respectfully disagreed, stating that the reference the Captain referred to was out of context: the 6-month requirement is on Page 4 of the By-Laws, nominations for the bi-annual elections. However, the Chairman and Secretary positions were filled according to the procedure on Page 7, "MAC Vacancies", which does not have that requirement.

Captain Lambert asked the body if any of the other members wanted to be in the Chairman position, but nobody responded in the affirmative.

Captain Lambert stated the By-Laws had some contradictions, and he was the authority to decide what applied. He said the By-Laws were currently under revision to include SNY considerations.

**Next meeting**    Captain Lambert said he would like to meet with us quarterly, or as needed. He said the M.A.C. will have monthly meetings with Lieutenant Contreras. Captain Lambert said he would be meeting with us in about a week with answers to the previous questions.

The meeting was adjourned at 1650 hours.

L. Gary H-48321
M.A.C. Secretary

J. Warner J-72537
M.A.C. Chairman

APPROVED / DISAPPROVED

M. Contreras
Correctional Lieutenant
M.A.C. Coordinator

APPROVED / DISAPPROVED

R.S. Lambert
Captain
Facility IV

– PAGE 8 –

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT

State of California                                                 Department of Corrections and Rehabilitation

# Memorandum

Date:       June 4, 2007

To:         Blum V42455 410-1-6L
            Avenal State Prison

Subject:  SECOND LEVEL APPEAL RESPONSE LOG NO: ASP-M-07-00693

APPEAL DECISION: Granted in part

ISSUE: You are appealing the issue of plumbing in building 410 which you have indicated needs immediate repair specifically sinks, toilets, showers and hot water temperature should be at 106 degrees Fahrenheit through out the building.

REQUESTED ACTION: That all plumbing be repaired in building 410, and install water heater to maintain hot water temperature at 106 degrees Fahrenheit.

INTERVIEWED BY: P. Myers Correctional Plant Manager, J. DonDiego, Correctional Counselor II

REFERENCES AND REGULATION: California Code of Regulations, Title 15, Section (CCR) 3052 Health and Safety Standards, 3190, 3270 General Policy. (Article 2-Security)

At the second level of review an inquiry was conducted which included a review of your appeal and all pertinent documentation. In researching the issues of your appeal it appears that no violation of departmental rules, regulations, or policies has occurred. You indicate that 50 % percent of the plumbing, toilets & sinks, to include hot water, in building 410 are in disrepair and it affects all inmates' hygiene and cleanliness. The amount of toilets not in working order causes inadequate restroom and shower facilities to support the current inmate population. It is noted that as one shower, toilet or sink is repaired, by the next day, two more break which causes hygiene issues.

Currently, ASP houses inmates at approximately 247% beyond the original design capacity. This taxes the existing plumbing which was built to Uniform Plumbing Code (UPC) standards at the time of its design and construction. Recognizing the increased use of the available toilets and showers, ASP Plant Operations staff work diligently to ensure optimum function of the toilets and showers within each housing unit. However, due to wear and tear caused by the additional inmate use, the institution has increased the ordering of new parts to maintain the current plumbing system. Due to uncontrollable outside issues with businesses ASP is contracted with to purchase parts delays on occasion occur. In addition, there have been unforeseen emergencies throughout the institution which cause delayS in the scheduled maintenance of each facility and on going repairs to the buildings identified as having constant plumbing issues. Currently, ASP is in the process of hiring additional Plumbers and Maintenance Mechanics to help maintain and alleviate the already increased maintenance repairs throughout the institution.

Blum V42455 410-1-6L
APPEAL LOG # ASP-M-07-00693
PAGE 2

After a thorough review of the issues of your appeal is granted in part, ASP/ Plant Operations is making all efforts to repair and maintain the current plumbing issues you've identified in building 410 and through out the institution.

You are advised that you may submit this issue for a higher level of review by completing section "H" of the CDC 602 and mailing the appeal directly to the address listed on the CDC 602.


N. D. DAWSON
Warden (A)
Avenal State Prison

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT

State of California                                                                          Department of Corrections

# Memorandum

Date  :    May 2, 2007

To    :    Captain D.A. Clendaniel,
           IMAC Coordinator
           Avenal State Prison

Subject:   Inmate Issues and Concerns Raised by the IMAC During the Preceding Fiscal
           Year

During the course of the preceding fiscal year the IMAC has been involved in attempting to modify and or improve the following issues and concerns raised by Avenal State Prison's inmate population:

1. Timely, adequate, comprehensive, and competent medical care for serious medical ills;

2. Inmate overcrowding as it adversely impacts the provision of medical and dental services; transmission of communicable diseases; availability of toilets, urinals, sinks, and showers; the selection of meals served; sanitation, inmate living space; prison violence; outdoor recreation, consistent weekly laundry services,  and other negative consequences;

3. Overall kitchen sanitation that includes food preparation, the storage of food before it is served to the inmate population, personal hygiene of inmates and staff who come into contact with food while be prepared and or served, and the contamination of inmate food  due  to  fly and rodent infestations, and the failure to serve toast when scheduled on menu;

4. The failure to repair broken toilets, urinals, sinks, shower fixtures, water fountains, and stopped-up sewage and water lines.  The inmate population is also concerned with the failure to maintain working cold water fountains;

5. Unabated fly infestations that manifest in inmate housing units, building used to store and prepare food, and outdoor recreational yards during summer months;

CDC 1617 (3 / 89)

6. The prison's unabated rodent infestation that en-compasses inmate housing units, buildings utilized to store and prepare inmate food, and other build-ing throughout the prison;

7. Access to and the quality of religious diets for Jewish, Muslim, and other inmates who practice orthodox religions;

8. Regular and timely access to inmate religious services, study groups, and other religious ac-tivities;

9. The quality of inmate drinking water;

10. The failure of prison officials to identify and transfer inmates who are high risk for contract-ing the progressive form of Valley Fever, implement Valley Fever dust control procedures, treat topsoil surrounding the prison with chemical agents (e.g. I-chloro-2-nitropropane [soil fungi-cide], wetting topsoil, oiling topsoil) to inhibit Coccidioides Immitis spores from becoming air-borne and being inhaled by prison inmates and staff, testing inmates and staff to identify re-active and non-reactive individuals, or take other actions to inhibit Valley Fever infections;

11. Timely delivery of inmate mail;

12. The failure to insure that inmates are allowed to access facility canteens during respective monthly canteen draws;

13. The timely delivery of inmate Personal Property Packages during facility lock-downs; and

14. The absence of programming opportunities (hobby, Arts-In-Corrections, band, etc.) for all inmates incarcerated within ASP.

Needless to say, there are many other sub-issues that have not been listed above, but these sub-issues essentially involve medical care, sanitation, pest abatement, and the absence of sufficient programming opportunities for ASP inmates.


Marion F. Miller, Jr.
IMAC Chairman
Avenal State Prison
Ext: #6254

Noted:   Captain D.A. Clendaniel
IMAC Coordinator
Avenal State Prison
Ext: #6256

MINIMUM STANDARDS FOR

LOCAL DETENTION FACILITIES

TITLE 24, PART 1, SECTION 13-102

AND PART 2, SECTION 470A

2001 REVISIONS

EXHIBIT



# MINIMUM STANDARDS FOR
# LOCAL DETENTION FACILITIES

## TITLE 24, PART 1, SECTION 13-102

## AND PART 2, SECTION 470A

## 2001 REVISIONS

13-102 (A) DEFINITIONS...........................................................................1

13-102 (B) EXCLUSIONS. .........................................................................5

13-102 (C) INITIAL PLANNING FOR A LOCAL DETENTION FACILITY. ...................6
   13-102 (c) 1. Letter of Intent............................................................ 6
   13-102 (c) 2. Needs Assessment Study................................................. 6
   13-102 (c) 3. Program Statement........................................................ 6
   13-102 (c) 4. Type III and Type IV Facilities in Existing Buildings................ 7
   13-102 (c) 5. Submittal of Plans and Specifications................................. 7
   13-102 (c) 6. Design Requirements. .................................................... 7
   13-102 (c) 7. Pilot Projects. ............................................................. 9
   13-102 (c) 8. Alternate Means of Compliance....................................... 10

470A.1 DEFINITIONS. ............................................................................11

470A.2 DESIGN CRITERIA FOR REQUIRED SPACES.......................................12
   470A.2.1   Reception and Booking......................................................... 12
   470A.2.2   Temporary Holding Cell or Room. ............................................ 12
   470A.2.3   Temporary Staging Cell or Room. ............................................ 12
   470A.2.4   Sobering Cell. .................................................................... 13
   470A.2.5   Safety Cell. ....................................................................... 13
   470A.2.6   Single-Occupancy Cells. ....................................................... 13
   470A.2.7   Double-Occupancy Cells. ...................................................... 14
   470A.2.8   Dormitories. ...................................................................... 14
   470A.2.9   Dayrooms. ........................................................................ 14
   470A.2.10 Exercise Area. ................................................................... 14
   470A.2.11 Correctional Program/Multipurpose Space.................................. 15
   470A.2.12 Medical Examination Room. .................................................. 15
   470A.2.13 Pharmaceutical Storage Space. ............................................... 15
   470A.2.14 Medical Care Housing. ........................................................ 15
   470A.2.16 Commissary. .................................................................... 16
   470A.2.17 Dining Facilities. ............................................................... 16

470A.2.18   Visiting Space. ............................................................................. 16
470A.2.19   Safety Equipment Storage. ........................................................... 16
470A.2.20   Janitors' Closet. ........................................................................... 16
470A.2.21   Storage Rooms. ............................................................................ 16
470A.2.22   Audio Monitoring System. ........................................................... 16
470A.2.23   Laundry Facilities. ....................................................................... 16
470A.2.24   Emergency Power. ........................................................................ 16
470A.2.25   Confidential Interview Rooms. ..................................................... 17
470A.2.26   Attorney Interview Space. ............................................................ 17

**470A.3   DESIGN CRITERIA FOR FURNISHINGS AND EQUIPMENT. ...............................17**
470A.3.1    Toilets /Urinals. ........................................................................... 17
470A.3.2    Wash Basins ................................................................................. 17
470A.3.3    Drinking Fountains. ...................................................................... 18
470A.3.4    Showers. ....................................................................................... 18
470A.3.5    Beds. ............................................................................................. 18
470A.3.6    Lighting ........................................................................................ 18
470A.3.7    Windows. ...................................................................................... 19
470A.3.8    Cell Padding. ................................................................................ 19
470A.3.9    Mirrors. ........................................................................................ 19
470A.3.10   Seating. ........................................................................................ 19
470A.3.11   Table/Seat. ................................................................................... 19
470A.3.12   Weapons Locker. .......................................................................... 19

# TITLE 24, PART 1

# ARTICLE 1, CHAPTER 13

**13-102 (a) DEFINITIONS.**

The following definitions shall apply:

1. "Administering medication," as it relates to managing legally obtained drugs, means the act by which a single dose of medication is given to a patient. The single dose of medication may be taken either from stock (undispensed) or dispensed supplies.

2. "Administrative segregation" means the physical separation of different types of inmates from each other as specified in Penal Code Sections 4001 and 4002, and Section 1053 of Title 15, CCR. Administrative segregation is accomplished to provide that level of control and security necessary for good management and the protection of staff and inmates.

3. "Alternate means of compliance" means a process for meeting or exceeding standards in an innovative way, after a pilot project evaluation, approved by the Board of Corrections pursuant to an application.

4. "Average daily population" means the average number if inmates housed daily during the last fiscal year.

5. "Board of Corrections" means the State Board of Corrections, which board acts by and through its executive director, deputy directors and field representatives.

6. "Court holding facility" means a local detention facility constructed within a court building after January 1, 1978, used for the confinement of persons solely for the purpose of court appearance for a period not to exceed 12 hours.

7. "Custodial personnel" means those officers with the rank of deputy, correctional officer, patrol persons, or other equivalent sworn or civilian rank whose primary duties are the supervision of inmates.

8. "Delivering medication" as it relates to managing legally obtained drugs, means the act of providing one or more doses or a prescribed and dispensed medication to a patient.

9. "Developmentally disabled" means those persons who have a disability which originates before an individual attains age 18, continues, or can be expected to continue indefinitely, and constitutes a substantial disability for that individual. This term includes mental retardation, cerebral palsy, epilepsy, and autism, as well as disabling conditions found to be closely related to mental retardation or to require treatment similar to that required for mentally retarded individuals.

10. "Direct visual observation" means direct personal view of the inmate in the context of his/her surrounding without the aid of audio/video equipment. Audio/video monitoring may supplement but not substitute for direct visual observation.

11. "Disciplinary isolation" means that punishment status assigned an inmate as the result of violating facility rules and which consists of confinement in a cell or housing unit separate from regular jail inmates.

12. "Dispensing," as it relates to managing legally obtained drugs, means the interpretation of the prescription order, the preparation, repackaging, and labeling of the drug based upon a prescription from a physician, dentist, or other prescriber authorized by law.

13. "Disposal," as it relates to managing legally obtained drugs, means the destruction of medication or its return to the manufacturer or supplier.

14. "Emergency" means any significant disruption of normal facility procedure, policies, or activities caused by a riot, fire, earthquake, attack, strike, or other emergent condition.

15. "Emergency medical situations" means those situations where immediate services are required for the alleviation of severe pain, or immediate diagnosis and treatment of unforeseeable medical conditions are required, if such conditions would lead to serious disability or death if not immediately diagnosed and treated.

16. "Facility/system administrator" means the sheriff, chief of police, chief probation officer, or other official charged by law with the administration of a local detention facility/system.

17. "Facility manager" means the jail commander, camp superintendent, or other comparable employee who has been delegated the responsibility for operating a local detention facility by a facility administrator.

18. "Health authority" means that individual responsible for health care services pursuant to a written agreement or job description. A health authority could include a city/county health officer, physician, or medical administrator. When this authority is other than a physician, final clinical decisions rest with a single designated responsible physician.

19. "Health care" means medical, mental health and dental services.

20. "Labeling," as it relates to managing legally obtained drugs, means the act of preparing and affixing an appropriate label to a medication container.

21. "Legend drugs" are any drugs defined as "dangerous drugs" under Chapter 9, Division 2, Section 4211 of the California Business and Professions Code. These drugs bear the legend, "Caution Federal Law Prohibits Dispensing Without a Prescription." The Food and Drug Administration (FDA) has determined because of toxicity or other potentially harmful

effects, that these drugs are not safe for use except under the supervision of a health care practitioner licensed by law to prescribe legend drugs.

22. "Licensed health personnel" includes but is not limited to the following classifications of personnel: physician/psychiatrist, dentist, pharmacist, physician's assistant, registered nurse/nurse practitioner/public health nurse, licensed vocational nurse, and psychiatric technician.

23. "Living areas" means those areas of a facility utilized for the day-to-day housing and activities of inmates. These areas do not include special use cells such as sobering, safety, and holding or staging cells normally located in receiving areas.

24. "Local detention facility" means any city, county, city and county, or regional jail, camp, court holding facility or other correctional facility, whether publicly or privately operated, used for confinement of adults or of both adults and minors, but does not include that portion of a facility for confinement of both adults and minors which is devoted only to the confinement of minors.

25. "Local detention system" means all of the local detention facilities that are under the jurisdiction of a city, county or combination thereof whether publicly or privately operated. Nothing in the standards are to be construed as creating enabling language to broaden or restrict privatization of local detention facilities beyond that which is contained in other statute.

26. "Local Health Officer" means that licensed physician who is appointed pursuant to Health and Safety Code Section 101000 to carry out duly authorized orders and statues related to public health within their jurisdiction.

27. "Managerial custodial personnel" means that jail commander, camp superintendent, or other comparable employee who has been delegated the responsibility for operating a local detention facility by a facility administrator.

29. "Mental Health Director" means that individual who is designated by contract, written agreement or job description, to have administrative responsibility for the facility or system mental health program.

30. "Non-sentenced inmate," means an inmate with any pending local charges or one who is being held solely for charges pending in another jurisdiction.

31. "Over-the-counter (OTC) Drugs," as it relates to managing legally obtained drugs, are medications which do not require a prescription (non-legend).

32. "People with disabilities" includes, but is not limited to, persons with a physical or mental impairment that substantially limits one or more of their major life activities or those persons with a record of such impairment or perceived impairment that does not include substance use disorders resulting from current illegal use of a controlled substance.

33. "Pilot Project" means an initial short-term method to test or apply an innovation or concept related to the operation, management or design of a local detention facility pursuant to application to, and approval by, the Board of Corrections.

34. "Procurement" as it relates to managing legally obtained drugs, means the system for ordering and obtaining medications for facility stock.

35. "Psychotropic medication" means any medication prescribed for the treatment of symptoms of psychoses and other mental and emotional disorders.

36. "Rated capacity" means the number of inmate occupants for which a facility's single and double occupancy cells or dormitories, except those dedicated for health care or disciplinary isolation housing, were planned and designed in conformity to the standards and requirements contained herein and in Title 15, CCR.

37. "Regional Center for Developmentally Disabled" means those private agencies throughout the state, funded through the Department of Developmental Services which assure provision of services to persons with developmental disabilities. Such centers will be referred to as regional centers in these regulations.

38. "Remodel" means to alter the facility structure by adding, deleting or moving any of the buildings' components thereby affecting any of the spaces specified in Title 24, Section 470A.

39. "Repackaging," as it relates to managing legally obtained drugs, means the transferring of medications from the original manufacturers' container to another properly labeled container.

40. "Repair" means to restore to original condition or replace with like-in-kind.

41. "Safety checks" means regular, intermittent and prescribed direct, visual observation to provide for the health and welfare of inmates.

42. "Sentenced inmate," means an inmate that is sentenced on all local charges.

43. "Shall" is mandatory; "may" is permissive.

44. "Sobering cell" as referenced in Section 1056, refers to an initial "sobering up" place for arrestees who are sufficiently intoxicated from any substance to require a protected environment to prevent injury by falling or victimization by other inmates.

45. "Storage," as it relates to legally obtained drugs, means the controlled physical environment used for the safekeeping and accounting of medications.

46. "Supervisory custodial personnel" means those staff members whose duties include direct supervision of custodial personnel.

47. "Temporary Holding facility" means a local detention facility constructed after January 1, 1978, used for the confinement of persons for 24 hours or less pending release, transfer to another facility, or appearance in court.

48. "Type I facility" means a local detention facility used for the detention of persons for not more than 96 hours, excluding holidays, after booking. Such a Type I facility may also detain persons on court order either for their own safekeeping or sentenced to a city jail as an inmate worker, and may house inmate workers sentenced to the county jail provided such placement in the facility is made on a voluntary basis on the part of the inmate. As used in this section, an inmate worker is defined as a person assigned to perform designated tasks outside of his or her cell or dormitory, pursuant to the written policy of the facility, for a minimum of four hours each day on a five day scheduled work week.

49. "Type II facility" means a local detention facility used for the detention of persons pending arraignment, during trial, and upon a sentence of commitment.

50. "Type III facility" means a local detention facility used only for the detention of convicted and sentenced prisoners.

51. "Type IV facility" means a local detention facility or portion thereof designated for the housing of inmates eligible under Penal Code Section 1208 for work/education furlough and/or other programs involving inmate access into the community.

**13-102 (b) EXCLUSIONS.**

Title 24 of the California Code of Regulations, Sections 13-102 and 470A which pertain to planning and design of detention facilities shall be applicable to facilities for which architectural drawings have been submitted to the State Board of Corrections for review. These requirements shall not be applicable to facilities which were constructed in conformance with the standards of the Board of Corrections in effect at the time of initial architectural planning. When any facility, designed and constructed under earlier Board of Corrections standards, can comply with a more recently adopted requirement, the last restrictive regulation shall apply.

If, in the course of inspection of local detention facilities, the Board of Corrections determines that a facility planned or built prior to these regulations does not meet the appropriate, applicable standards in effect at the time of initial architectural planning, the local governing body shall submit to the Board of Corrections for their approval within one year of such inspection a plan for causing that facility to meet current standards. Such a plan shall include the specific building areas which need to be remodeled and/or constructed, a definite time period over which the proposed modifications are planned, and a cost estimate including a description of the method of financing.

**13-102 (c)  INITIAL PLANNING FOR A LOCAL DETENTION FACILITY.**

**13-102 (c) 1.  Letter of Intent.**

A city, city and county, county, or any combination thereof which has an intent to build or remodel any local detention facility shall immediately file a letter of intent with the Board of Corrections.

**13-102 (c) 2.  Needs Assessment Study.**

Any city, county, city and county, or region intending to construct a new Type I, II, III, or IV facility or add 25 or more beds to an existing facility shall complete a needs assessment study. One copy of the needs assessment study shall be submitted to the Board of Corrections prior to contracting for plans and specifications.

The needs assessment shall include but not be limited to a description of:

A. the elements of the system;
B. the department's operational and design philosophy;
C. the current inmate population;
D. the classification system;
E. program needs, including planned academic programs including special education programs and an analysis of performance in using programs which can reduce secure facility requirements;
F. an analysis of the local trends and characteristics which influence planning assumptions about future corrections' systems change, including population projections, current and projected inmate populations, and program costs based on continuation of current policies and projections of alternative policies or programs on inmate population growth and program costs;
G. the adequacy of staffing levels;
H. the ability to provide visual supervision;
I. the adequacy of record keeping;
J. a history of the systems compliance with standards; and,
K. any unresolved issues.

**13-102 (c) 3.  Program Statement.**

Unless the construction or remodeling is of a minor nature, not affecting the capacity or flow of the facility, a program statement shall be developed by the facility administrator and submitted to the Board of Corrections for the purpose of providing the basis upon which architectural plans are drawn. The program statement must be submitted with the schematic architectural plans required by Section 13-102(c)5 of these regulations and must include a description of the following:

A. Intended capacity of facility.
B. Security and classification of inmates to be housed.

C. Inmate movement within the facility and entry and exit from security areas.
D. Food preparation and serving.
E. Staffing.
F. Booking.
G. Visiting and attorney interviews.
H. Exercise.
I. Programs.
J. Medical services, including the management of communicable diseases.
K. Cleaning and/or laundering.
L. Inmate segregation as specified in Penal Code Sections 4001 and 4002 and Article 5 of Title 15, CCR.
M. Court holding and inmate movement.
N. Mental health services.
O. Facilities for jail administration and operations staff.
P. Staff to staff communications system.
Q. Management of disruptive inmates.
R. Management and placement of persons with disabilities with provisions for wheelchairs, gurney access, and for evacuation during emergencies.
S. Architectural treatment of space relative to preventing suicides by inmates.
T. Method of implementing Penal Code Section 4030 relating to the holding of misdemeanant arrestees without the necessity of unjustified strip searches.
U. Intended type of facility.
V. Sobering cells(s) as referenced by Title 15, Section 1056, with the ability to segregate.
W. Safety cell(s) as referenced by Title 15, Section 1055.

## 13-102 (c) 4. Type III and Type IV Facilities in Existing Buildings.

Wherever a city, county, or combination thereof, intends to establish a Type III or Type IV facility in an existing building or buildings, notice shall be given to the Board of Corrections whose staff shall complete a survey to determine capacity of such buildings and shall make recommendations for necessary modifications. The proposing local government shall secure the appropriate clearance from the health authority, building official, and State Fire Marshal.

## 13-102 (c) 5. Submittal of Plans and Specifications.

All plans and specifications submitted to the Board of Corrections in compliance with Penal Code Section 6029 shall be in duplicate at the schematic design phase, at the design development phase and when the construction document drawings and specifications are developed. A copy of the plans will be forwarded by the Board to the State Fire Marshal for review. Board of Corrections staff shall respond in writing indicating compliance or non-compliance with these regulations.

## 13-102 (c) 6. Design Requirements.

A. The design of a local detention facility shall comply with provisions of California Code of Regulations, Title 24, Part 2, Section 470A.

B.  The design of a Type I, Type II, Type III, or Type IV facility, shall provide the following:

(1) Fire safety.  The provisions of Title 19 as they relate to detention facilities shall be incorporated into the facility design.

(2) Suicide Hazards.  Architectural plans shall be reviewed by the Board for the purpose of reducing hazards posed by fixtures and equipment which could be used for an act of suicide by an inmate.  The facility design shall avoid any surfaces, edges, fixtures, or fittings that can provide an attachment for self-inflicted injury.  The following features shall be incorporated in the design of temporary holding cells, temporary staging cells, sobering cells, safety cells, single occupancy cells, and any other area where an inmate may be left alone:

(a)  plumbing shall not be exposed.  Operation of control valves shall use flush buttons or similar.  The drinking fountain bubbler, shall be without curved projections;

(b)  towel holders shall be ball-in-socket or indented clasp, not pull-down hooks or bars;

(c)  supply and return grilles shall have openings no greater than 3/16 inch or have 16-mesh per square inch;

(d)  beds, desk surfaces, and shelves shall have no sharp edges and be configured to prevent attachment;

(e)  light fixtures shall be tamper resistant;

(f)  fixtures such as mirrors shall be mounted using tamper resistant fasteners; and,

(g)  fire sprinkler heads inside rooms shall be designed to prevent attachment.

(3) Health and sanitation.  Provisions of Subchapter 4, Title 15, California Code of Regulations, and of the California Uniform Retail Food Facilities Law as they relate to detention facilities shall be incorporated into the facility design.

(4) Single and/or double occupancy cells.  In any local detention system the number of single and/or double occupancy cells shall be that number, determined by the facility/system administrator in conjunction with the Board of Corrections, necessary to safely manage the population of the facility/system based on a comprehensive needs assessment which accounts for those inmates projected to be:

(a)  administrative segregation cases,

(b)  persons with disabilities,

(c)  custodial problems, and/or

(d)  likely to need individual housing for other specific reasons as determined by the facility/system administration.

The total number of single and/or double occupancy cells shall not be less than 10 percent of the system's Board of Corrections rated capacity.  The local detention facility/system shall comply with all other design requirements contained in these regulations.

(5) Staff and inmate safety.  Facilities shall be designed and/or equipped in such a manner that staff and inmates have the ability to summon immediate assistance in the event of an incident or an emergency.

(6) Heating and cooling.  Provision shall be made to maintain a comfortable living environment in accordance with the heating, ventilating, and air conditioning requirements of Parts 2 and 4, and the energy conservation requirements of Part 6, Title 24, California Code of Regulations.

    (7)   Acoustics. Housing areas shall be designed and constructed so that the average noise level does not exceed 70 decibels during periods of activity and 45 decibels during sleeping hours.

    (8)   Living Areas. Living areas shall be separated from the area for reception and booking.

    (9)   Spaces for persons with disabilities.

        (a)   Housing cell or room. A cell or room for an inmate with a disability using a wheelchair must have an appropriate entry and toilet, wash basin and drinking fountain which the inmate can utilize without personal assistance.

        (b)   Other spaces within the security perimeter such as day rooms and activity areas shall be located such that persons with disabilities will not be excluded from participating in any program for which he or she would otherwise be eligible. Accessible showers for inmates with disabilities shall be available.

        (c)   Spaces outside the security perimeter. Public areas of a local detention facility shall comply with the applicable chapters of Title 24, Part 2 of the California Code of Regulations.

   (10)  Security. The design should facilitate security and supervision appropriate to the level of inmate custody.

   (11)  Glazing. Internal and external facility glazing shall be appropriate to the security level of the detention area or room.

   (12)  Hair care space. Space and suitable equipment must be provided in all Type II or Type III facilities for men's haircutting and/or female hairdressing.

   (13)  Floor drains shall be provided where operationally and mechanically appropriate.

   (14)  Medical/mental health care housing shall be designed in consultation with the health authority. Medical/mental health areas may contain other than single occupancy rooms.

C.  The design of a court holding or temporary holding facility must include and comply with the following subsections of Section 13-102(c)6B: (1), (2), (3), (5), (6), (7), (9), (10), and (12). Court holding facilities shall have separate paths of travel for inmates from those used by the public.

### 13-102 (c) 7. Pilot Projects.

Whenever a city, county, city and county, or any combination thereof intends to develop a facility which requires an extreme departure from these building regulations for the purpose of experimenting with building systems and/or new designs, the Board of Corrections may grant that facility status as a pilot project on application. Such an application for a Pilot Project status shall contain, at a minimum, the following information:

A.  The regulations which Pilot Project status will affect.

B.  Criteria and documentation that the safety of staff and inmates will not be jeopardized.

C.  A statement of the goals the pilot project is intended to achieve.

D.  A progress reporting process, to the Board of Corrections, which evaluates the attainment of goals or the progress toward goal attainment.

E.  Any additional information or explanation that will assist the Board of Corrections to arrive at a decision.

**13-102 (c) 8. Alternate Means of Compliance.**

Because circumstances, limitations, and the rapid development of new technology cannot be foreseen as these building regulations are being developed, the Board of Corrections may, upon application of a city or county, approve an alternate means of compliance with these regulations. Such an application for approval shall include, at least, the following information:

A.  Review of case law pertinent to the proposal, including any lawsuits brought against the applicant city or county detention facility.
B.  The applicant's history of compliance or noncompliance with Title 15 and Title 24 minimum jail standards.
C.  A summary of the "totality of conditions" in the facility or facilities, including but not limited to:
    (1)  program activities, exercise and recreation;
    (2)  adequacy of supervision;
    (3)  types of inmates affected; and,
    (4)  inmate classification procedures.
D.  A statement of how the alternative will contribute to solution of the problem.
E.  An overall plan of facilities development including time limits where appropriate.
F.  A statement of how the overall goal of providing safety to staff and inmates will be achieved within the alternate means of compliance.
G.  A statement which indicates that the alternate means of compliance will provide an enhanced compliance with current regulations.

# TITLE 24, PART 2

# DIVISION VIII

**470A.1 DEFINITIONS.**

**Board of Corrections** means the State Board of Corrections, which acts by and through its executive officer, deputy director and field representatives.

**Living Areas** means those areas of a facility utilized for the day-to-day housing and activities of inmates. These areas do not include special-use cells such as sobering, safety and holding or staging cells normally located in receiving areas.

**Local Detention Facilities** means any city, county, city and county, or regional jail, camp, court holding facility or other correctional facility, whether publicly or privately operated, used for the confinement of adults or of both adults and minors, but does not include that portion of a facility for the confinement of both adults and minors which is devoted only to the confinement of minors. The types of local detention facilities are as follows:

**Court Holding Facility** means a local detention facility constructed within a court building after January 1, 1978, used for the confinement of persons solely for the purpose of a court appearance for a period not to exceed 12 hours.

**Temporary Holding Facility** means a local detention facility constructed after January 1, 1978, used for the confinement of persons for 24 hours or less pending release, transfer to another facility or appearance in court.

**Type I Facility** means a local detention facility used for the detention of persons for not more than 96 hours, excluding holidays, after booking. Such a Type I facility may also detain persons on court order either for their own safekeeping or sentenced to a city jail as an inmate worker, and may house inmate workers sentenced to the county jail provided such placement in the facility is made on a voluntary basis on the part of the inmate. As used in this section, an inmate worker is defined as a person assigned to perform designated tasks outside of his or her cell or dormitory, pursuant to the written policy of the facility, for a minimum of four hours each day on a five day scheduled work week.

**Type II Facility** means a local detention facility used for the detention of persons pending arraignment, after arraignment, during trial and upon a sentence of commitment.

**Type III Facility** means a local detention facility used only for the detention of convicted and sentenced persons.

**Type IV Facility** means a local detention facility or portion thereof designated for the housing of inmates eligible, under Penal Code Section 1208, for work/education furlough and/or other programs involving inmate access into the community.

**Rated Capacity** means the number of inmate occupants for which a facility's single and double occupancy cells or dormitories, except those dedicated for medical or disciplinary isolation housing, were planned and designed in conformity to the standards and requirements contained herein and in Title 15, CCR.

## 470A.2  DESIGN CRITERIA FOR REQUIRED SPACES.

### 470A.2.1  Reception and Booking.
Facilities where booking and housing occur shall have the following space and equipment:

| | |
|---|---|
| 470A.2.1.1 | Weapons locker as specified in Section 470A.3.12. |
| 470A.2.1.2 | A cell or room for the confinement of inmates pending their booking, complying with Section 470A.2.2. |
| 470A.2.1.3 | A sobering cell as described in Section 470A.2.4, if intoxicated inmates who may pose a danger to themselves or others are held.  For those facilities that accept male and female intoxicated inmates, two sobering cells shall be provided. |
| 470A.2.1.4 | Access to a shower within the secure portion of the facility. |
| 470A.2.1.5 | Provide access to a secure vault or storage space for inmate valuables. |
| 470A.2.1.6 | A safety cell or cells as described in Section 470A.2.5 if the program statement identifies the need for such a cell. |
| 470A.2.1.7 | Telephones which are accessible to the inmates. |
| 470A.2.1.8 | Unobstructed access to hot and cold running water for staff use. |

### 470A.2.2  Temporary Holding Cell or Room.
A temporary holding cell or room shall:

| | |
|---|---|
| 470A.2.2.1 | Contain a minimum of 10 square feet of floor area per inmate; |
| 470A.2.2.2 | Be limited to no more than 16 inmates; |
| 470A.2.2.3 | Be no smaller than 40 square feet and have a clear ceiling height of 8 or more feet; |
| 470A.2.2.4 | Contain seating to accommodate all inmates as required in Section 470A.3; |
| 470A.2.2.5 | Contain a toilet, wash basin and drinking fountain as specified in Section 470A.3; |
| 470A.2.2.6 | Maximize visual supervision of inmates by staff; and, |
| 470A.2.2.7 | When located in a temporary holding facility, the cell or room shall be equipped with a bunk if inmates are to be held longer than 12 hours. |

### 470A.2.3  Temporary Staging Cell or Room.
A temporary staging cell or room shall:

| | |
|---|---|
| 470A.2.3.1 | Be constructed for the purpose of holding inmates who have been classified and segregated in accordance with Sections 1050 and 1053 of Title 15, Division 1, California Code of Regulations. |
| 470A.2.3.2 | Be limited to holding inmates up to four hours. |
| 470A.2.3.3 | Be limited to no more than 80 inmates. |

470A.2.3.4    Contain a minimum of 10 square feet of floor area per inmate and a clear ceiling height of 8 or more feet.
470A.2.3.5    Be no smaller than 160 square feet.
470A.2.3.6    Contain seating to accommodate all inmates as required in Section 470A.3.
470A.2.3.7    Contain toilets, wash basins and drinking fountains as specified in Section 470A.3.
470A.2.3.8    Maximize visual supervision of inmates by staff.

**470A.2.4  Sobering Cell.**
A sobering cell shall:
470A.2.4.1    Contain a minimum of 20 square feet of floor area per inmate;
470A.2.4.2    Be limited to 8 inmates;
470A.2.4.3    Be no smaller than 60 square feet and have a clear ceiling height of 8 or more feet;
470A.2.4.4    Contain a toilet, wash basin and drinking fountain as specified in Section 470A.3;
470A.2.4.5    Have padded partitions located next to toilet fixture in such a manner that they provide support to the user;
470A.2.4.6    Maximize visual supervision of inmates by staff; and,
470A.2.4.7    Be padded on the floor as specified in Section 470A.3.
470A.2.4.8    Have accessible a shower in the secure portion of the facility.

**470A.2.5  Safety Cell.**
A safety cell shall:
470A.2.5.1    Contain a minimum of 48 square feet of floor area with no one floor dimension being less than 6 feet and a clear ceiling height of 8 or more feet;
470A.2.5.2    Be limited to one inmate;
470A.2.5.3    Contain a flushing ring toilet, capable of accepting solid waste, mounted flush with the floor, the controls for which must be located outside of the cell;
470A.2.5.4    Be padded as specified in Section 470A.3;
470A.2.5.5    Be equipped with a variable intensity, security-type lighting fixture which is inaccessible to the inmate occupant, control of which is located outside of the cell;
470A.2.5.6    Provide one or more vertical view panels not more than 4 inches wide nor less than 24 inches long which shall provide a view of the entire room; and,
470A.2.5.7    Provide a food pass with lockable shutter, no more than 4 inches high, and located between 26 inches and 32 inches as measured from the bottom of the food pass to the floor.
470A.2.5.8    Any wall or ceiling mounted devices must be inaccessible to the inmate occupant.

**470A.2.6  Single-Occupancy Cells.**
Single-occupancy cells shall:
470A.2.6.1    Have a maximum capacity of one inmate;
470A.2.6.2    Contain a minimum of 60 square feet of floor area in Type I facilities and 70 square feet of floor area in Type II and Type III facilities;
470A.2.6.3    Have a minimum clear ceiling height of 8 feet and a minimum width of 6 feet;
470A.2.6.4    Contain a toilet, wash basin and drinking fountain as specified in Section 470A.3; and,

470A.2.6.5    Contain a bunk, desk and seat as specified in Section 470A.3.
                 EXCEPTION:  A Type I facility does not require a desk and seat.

### 470A.2.7 Double-Occupancy Cells.

Double-occupancy cells shall:

470A.2.7.1    Have a maximum capacity of two inmates;
470A.2.7.2    Contain a minimum of 60 square feet of floor area in Type I facilities and 70 square feet of floor area in Type II and Type III facilities;
470A.2.7.3    Have a minimum clear ceiling height of 8 feet and a minimum width of 6 feet;
470A.2.7.4    Contain a toilet, wash basin and drinking fountain as specified in Section 470A.3; and,
470A.2.7.5    Contain two bunks, and at least one desk and seat as specified in Section 470A.3.
                 EXCEPTION:  A Type I facility does not require a desk and seat.

### 470A.2.8 Dormitories.

Dormitories shall:

470A.2.8.1    Contain a minimum of 50 square feet of floor area per inmate for a single-bed unit; a minimum of 70 square feet for a double-bed unit; and a minimum of 90 square feet for a triple bed unit and have a minimum ceiling height of 8 feet;
470A.2.8.2    Be designed for no more than 64 inmates and no less than 4 inmates;
470A.2.8.3    Provide access to toilets separate from the wash basin and drinking fountains as specified in Section 470A.3; and,
470A.2.8.4    In other than Type I facilities, provide secure storage of personal items and clothing for each occupant.

### 470A.2.9 Dayrooms.

Dayrooms or dayroom space shall:

470A.2.9.1    Contain 35 square feet of floor area per inmate;
470A.2.9.2    Contain tables and seating to accommodate the maximum number of inmates allowed access at a given time.
470A.2.9.3    Provide access to toilets, wash basins and drinking fountains as specified in Section 470A.3;
470A.2.9.4    Provide access to a shower or showers as specified in Section 470A.3; and,
470A.2.9.5    Be provided to all inmates in Type II and Type III facilities (except those housed in special use cells) and to inmate workers in Type I facilities.

Dayroom space as described in this section may be a part of a single occupancy cell used for administrative segregation or a dormitory, in which case the floor area of the cell or a dormitory must be increased by the square footage required for the dayroom.

### 470A.2.10 Exercise Area.

An outdoor exercise area or areas must be provided in every Type II and Type III facility.  The minimum clear height must be 15 feet and the minimum number of square feet of surface area will be computed by multiplying 80 percent of maximum rated population by 50 square feet and dividing the result by the number of one-hour exercise periods per day.

There must be at least one exercise area of not less than 600 square feet. The design shall facilitate security and supervision appropriate to the level of custody.

The exercise area must contain or provide free access to a toilet, wash basin and drinking fountain as provided in Section 470A.3.

Type IV facilities shall have an outdoor recreation area or access to community recreation facilities.

**470A.2.11  Correctional Program/Multipurpose Space.**
An area for correctional programming must be provided in every Type II and Type III facility. The program area and furnishings shall be designed to meet the needs specified by the facility's program statement.

Type IV facilities shall have multipurpose space for games and activities, dining, visiting, TV, meetings, and quiet space for study and reading, such that activities do not conflict with each other.

**470A.2.12  Medical Examination Room.**
There must be a minimum of one suitably equipped medical examination room in every facility which provides on-site health care. The examination room shall be designed in consultation with the responsible physician/health authority. Such a medical examination room shall:
470A.2.12.1   Be located within the security area and provide for privacy of the inmates;
470A.2.12.2   Provide not less than 100 square feet of floor space with no single dimension less than 7 feet; and,
470A.2.12.3   Provide hot and cold running water.
470A.2.12.4   Provide lockable storage for medical supplies.
470A.2.12.5   Any room where medical procedures are provided must be equipped with hot and cold running water.

**470A.2.13  Pharmaceutical Storage Space.**
Provide lockable storage space for medical supplies and pharmaceutical preparations as referenced by 15 California Code of Regulations 1216.

**470A.2.14  Medical Care Housing.**
There shall be some means to provide medical care and housing of ill and/or infirm inmates. When the program statement for a Type II or Type III facility indicates that medical care housing is needed, such housing must provide lockable storage space for medical instruments and must be located within the security area of the facility accessible to both female and male inmates, but not in the living area of either. The medical care housing unit shall be designed in consultation with the health authority. Medical/mental health areas may contain other than single occupancy cells.

If negative pressure isolation rooms are being planned, they shall be designed to recognized industry standards.

**470A.2.16  Commissary.**
In all Type II, III, and IV facilities, except where community access is available, there shall be provision made for inmates to purchase items.  When commissary supplies are kept within the security perimeter of a facility, an area shall be provided for the secure storage of the stock for such inmate canteen items.

**470A.2.17  Dining Facilities.**
In all Type II, III and IV facilities which serve meals, dining areas shall be provided which will allow groups of inmates to dine together.  Such dining areas shall not contain toilets or showers in the same room without appropriate visual barrier.  Wherever the facility contains a central dining room or rooms, it shall contain a minimum of 15 square feet of floor space and sufficient tables and seating for each inmate being fed.

**470A.2.18  Visiting Space.**
Space shall be provided in all Type I, II, III and IV facilities for visiting.

**470A.2.19  Safety Equipment Storage.**
A secure area shall be provided for the storage of safety equipment such as fire extinguishers, self-contained breathing apparatus, wire and bar cutters, emergency lights, etc.

**470A.2.20  Janitors' Closet.**
In Type II facilities, at least one securely lockable janitors' closet, with sufficient area for the storage of cleaning implements and supplies, must be provided within the security areas of the facility.  A mop sink shall also be available within the security area of the facility.  In court holding, temporary holding, Type I, III and IV facilities, the closet need not be in the security area.

**470A.2.21  Storage Rooms.**
One or more storage rooms shall be provided to accommodate a minimum of 80 cubic feet of storage area per inmate for inmate clothing and personal property, institutional clothing, bedding, and supplies.  Court holding, temporary holding and Type I facilities may be excluded from the storage space requirement for personal and institutional clothing unless clothing is issued.

**470A.2.22  Audio Monitoring System.**
In court holding, temporary holding, Type I and Type II facilities, and in Type III facilities housing inmates classified higher than minimum security, there must be an inmate- or sound-actuated audio monitoring system which is capable of alerting personnel stationed in a central control point.

**470A.2.23  Laundry Facilities.**
In Type IV facilities, provision shall be made for washing and drying of personal clothing by machines, either in the facility or in the community, if access is permitted for same.

**470A.2.24  Emergency Power.**

There shall be a source of emergency power in all detention facilities capable of providing minimal lighting in all housing units, activities areas, corridors, stairs, and central control points, and to maintain fire and life safety, security, communications, and alarm systems. Such an emergency power source shall conform to the requirements specified in Title 24, Part 3, Article 700, California Electrical Code, California Code of Regulations.

**470A.2.25 Confidential Interview Rooms.**
There must be a minimum of one suitably furnished interview room for confidential interviews in every facility which provides on-site health care. The interview room shall be designed in consultation with responsible custody staff and health care staff. Such an interview room shall:
470A.2.25.1   Be located within the security area accessible to both female and male inmates, and,
470A.2.25.2   Provide not less than 70 square feet of floor space with no single dimension less than 6 feet.

**470A.2.26 Attorney Interview Space.**
All facilities except Type IV facilities shall include attorney interview areas which provide for confidential consultation with inmates.

**EXCEPTION: The design of court holding and temporary holding facilities shall include the following required spaces from Section 470A.2; .2, .19, .20, .21, .22, .24, and .26.**

**470A.3  DESIGN CRITERIA FOR FURNISHINGS AND EQUIPMENT.**

Furnishings and equipment shall be as follows:

**470A.3.1  Toilets /Urinals**
must be provided in single occupancy cells and double occupancy cells.

In dormitories, toilets/urinals must be provided in a ratio to inmates of 1:10.

Toilets/urinals must be accessible to the occupants of dayrooms and exercise areas.

In temporary holding cells and temporary staging cells toilets/urinals must be provided in a ratio to inmates of 1:16.

In sobering cells toilets/urinals must be provided in a ratio to inmates of 1:8.

One urinal or two feet of urinal trough may be substituted for each toilet up to one third of the total number of toilets required, except in those facilities or portions thereof used for females.

NOTE: Toilet areas shall provide modesty for inmates with staff being able to visually supervise.

**470A.3.2  Wash Basins**
must be provided in single occupancy cells and double occupancy cells.

In dormitories, wash basins must be provided in a ratio to inmates of 1:10.

Wash basins must be accessible to the occupants of dayrooms and exercise areas.

In temporary holding cells and temporary staging cells wash basins must be provided in a ratio to inmates of 1:16.

In sobering cells wash basins must be provided in a ratio to inmates of 1:8.

Wash basins must be provided with hot and cold or tempered water.

Two feet of wash basin trough may be substituted for each basin required.

### 470A.3.3  Drinking Fountains.

There must be a minimum of one drinking fountain in every single-occupancy cell, double occupancy cell, dormitory, temporary holding cell, temporary staging cell, and sobering cell, and be accessible to the occupants of dayrooms and exercise areas.  Additional drinking fountains shall be located in other areas of the facility so that drinking water will be available to inmates and staff.  Such drinking fountains must meet the following minimum health requirements:

470A.3.3.1    The drinking fountain bubbler shall be on an angle which prevents waste water from flowing over the drinking fountain bubbler.

470A.3.3.2    Water flow shall be actuated by mechanical means.

### 470A.3.4  Showers.

must be available to all inmates on a ratio of at least one shower to every 20 inmates or fraction thereof and must provide hot and cold water or tempered water.  Shower stalls/shower areas must be designed and constructed of materials which are impervious to water and soap so they may be easily cleaned.

NOTE:  Shower areas shall provide modesty for inmates with staff being able to visually supervise.

### 470A.3.5  Beds.

must be elevated off the floor, have a solid bottom, and a sleeping surface of at least 30 inches wide and 76 inches long. Multiple beds must have a minimum of 21 inches between bed pans. Except in minimum security areas, beds must be securely fastened to the floor and/or the wall.

### 470A.3.6  Lighting.

in housing units, dayrooms and activity areas must be sufficient to permit easy reading by a person with normal vision, and shall not be less than 20 footcandles at desk level and in the grooming area.

Lighting shall be centrally controlled and/or occupant controlled in housing cells or rooms.

Night lighting in these areas shall be sufficient to give good visibility for purposes of supervision.

In minimum security areas, lighting may be supplied by ordinary lighting fixtures, and in areas of higher security, light fixtures must be of secure design.

### 470A.3.7 Windows.

In housing areas of higher than minimum security, windows which are constantly accessible to inmates for escape must be designed and constructed so that if broken out, the net area accessible for escape is no greater than 5 inches in one dimension.

### 470A.3.8 Cell Padding.

In sobering cells, the floor and partition shall be padded. In safety cells, padding must cover the entire floor, doors, and walls and everything on them to a clear height of 8 feet.

All such padded cells must be equipped with a tamper-resistant fire sprinkler as approved by the state fire marshal. All padding must be:

| | |
|---|---|
| 470A.3.8.1 | Approved for use by the state fire marshal; |
| 470A.3.8.2 | Nonporous to facilitate cleaning; |
| 470A.3.8.3 | At least ½-inch thick; |
| 470A.3.8.4 | Of a unitary or laminated construction to prevent its destruction by teeth, hand tearing or small metal objects; |
| 470A.3.8.5 | Firmly bonded to all padded surfaces to prevent tearing or ripping; and, |
| 470A.3.8.6 | Without any exposed seams susceptible to tearing or ripping. |

### 470A.3.9 Mirrors.

A mirror of a material appropriate to the level of security must be provided near each wash basin specified in these regulations.

### 470A.3.10 Seating.

In temporary holding and temporary staging cells, seating must be securely fixed to the floor and/or wall. When bench seating is used, eighteen inches of bench is seating for one person.

### 470A.3.11 Table/Seat.

In single and double occupancy cells, a table and seat for the purpose of writing and dining shall be provided.
EXCEPTION: A Type I facility does not require a table and seat.

### 470A.3.12 Weapons Locker.

A secure weapons locker shall be located outside the security perimeter of the facility such that no officer shall bring into the security area any weapon. Such weapons lockers shall be equipped with individual compartments, each with an individual locking device. Weapons lockers are required for temporary and court holding facilities and in all facilities of higher than minimum security.

**EXCEPTION: The design of court holding and temporary holding facilities shall include the design criteria for furnishings and equipment from Section 470A.3; .1, .2, .3, .6, .10, and .12.**

# PROOF OF SERVICE BY MAIL

**I THE UNDERSIGNED, CERTIFY THAT I AM OVER THE AGE OF EIGHTEEN (18) YEARS OF AGE. THAT I**

**CAUSED TO BE SERVED A COPY OF THE FOLLOWING DCOUMENT:**

**ENTITLED:** SUMMONS AND COMPLAINT UNDER THE CIVIL RIGHTS ACT 42 U.S.C.

§ 1983; AND NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION

AND APPOINTMENT OF CLASS COUNSEL OR INTERIM CLASS COUNSEL.

**BY PLACING THE SAME IN AN ENVELOPE, SEALING IT BEFORE A CORRECTIONAL OFFICER,**

**AND DEPOSITING IT IN THE [ _UNITED STATES MAIL_ ] AT AVENAL STATE PRISON AND ADDRESSEDIT**

**TO THE FOLLOWING:** ARNOLD SCHWARZENEGGER, Governor California; JAMES E.
TILTON, Secretary California Department of Corrections and Rehabilitation;
WILLIAM L. GAUSEWITZ, Director California Department of Correction and
Rehabilitation; LONNIE WATSON, Warden Avenal State Prison; BRIAN WYNN,
Associate Warden Business Services; ERICA WEINSTEIN,M.D., M.B.A., Chief
Medical Officer; DOUGLAS E. CHAFFER, Plant Supervisor(A); L. OACHA,
Associate Warden Facilities 3 and 4; and EDMUND G. BROWN, JR., Attorney
General State of California.

AT: 1300 I Street, Suite 125, P.O. BOX 944255
Sacramento, CA 94244-2550
Attorney for Defendants/Respondents.

**EXECUTED ON** SEPTEMBER , 06 , 20 07 **AT AVENAL STATE PRISON, AVENAL CALIFORNIA**

I, CHARLES WALTON, JR. **DECLARE UNDER THE PENALTY OF PERJURY UNDER THE LAW**

**OF THE STATE OF CALIFORNIA THAT THE FOREGOING IS TRUE AND CORRECT.**

_____
**SIGNITURE OF DECLARANT**

CHARLES WALTON, JR._____
**PRINT NAME OF DECLARANT**

**PRO PER.**

# PROOF OF SERVICE BY MAIL

I THE UNDERSIGNED, CERTIFY THAT I AM OVER THE AGE OF EIGHTEEN (18) YEARS OF AGE. THAT I

CAUSED TO BE SERVED A COPY OF THE FOLLOWING DCOUMENT:

ENTITLED: SUMMON AND COMPLAINT UNDER THE CIVIL RIGHTS ACT 42 U.S.C.

§ 1983; AND NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION

AND APPOINMENT OF CLASS COUNSEL OR INTERIM CLASS COUNSEL.

BY PLACING THE SAME IN AN ENVELOPE, SEALING IT BEFORE A CORRECTIONAL OFFICER,

AND DEPOSITING IT IN THE [ *UNITED STATES MAIL* ] AT AVENAL STATE PRISON AND ADDRESSEDIT

TO THE FOLLOWING:
OFFICE OF THE SECRETARY OF THE STATE OF CALIFORNIA.
DEBRA BOWEN, Secretary
1500 11th, Suite 600
SACRAMENTO, CA 95814

AND: EDMUND G. BROWN, JR.,
ATTORNEY GENERAL STATE OF CALIFORNIA
AT: 1300 I STREET, Suite 125
P.O. BOX 944255; Attorney for Defendants/Respondents.
SACRAMENTO, CA 94244-2550

EXECUTED ON __SEPTEMBER__ , 09 , 20 _07_  AT AVENAL STATE PRISON, AVENAL CALIFORNIA

I, __JOSEPH W. JONES__ DECLARE UNDER THE PENALTY OF PERJURY UNDER THE LAW

OF THE STATE OF CALIFORNIA THAT THE FOREGOING IS TRUE AND CORRECT.

SIGNITURE OF DECLARANT

JOSEPH W. JONES

PRINT NAME OF DECLARANT

PRO PER.



CONFIDENTIAL LEGAL MAIL

AVENAL STATE PRISON

Confidential

LEGAL MAIL
SEP 1 2 2007
AVENAL STATE PRISON
MAILROOM

RECEIVED
SEP 2007
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Avenal State Prison
PO Box 8
Avenal CA 93204

Office of the Clerk
United States District Court
Northern District of California
450 Golden Gate Avenue
PO Box 36060
San Francisco, CA
94102

$ 04.909
US POSTAGE